**Frank STANDT, Plaintiff,**

v.

**The CITY OF NEW YORK, P.O. Tuozzolo, P.O. Applewhite, Sergeant Chu, Sergeant Dempsey, Sergeant Anderson, Sergeant McKernan, Police Officers John Does # 1–5, Defendants.**

**No. 99 Civ. 11008(RWS).**

United States District Court,
S.D. New York.

July 19, 2001.

Emery Cuti Brinckerhoff & Abady, New York, NY, By: Ilann M. Maazel, John R. Cuti, Matthew D. Brickerhoff, for Plaintiff, of counsel, for plaintiff.

The Honorable Michael D. Hess, Corporation Counsel of the City of New York, New York, NY, By: Seth M. Rosen, Assistant Corporation Counsel, for Defendants, of counsel, for defendants.

## OPINION

SWEET, District Judge.

Defendants Police Officer Tuozzolo ("Tuozzolo"), P.O. Applewhite ("Applewhite"),

Sgt. Chu ("Chu"), Sgt. Dempsey ("Dempsey"), Sgt. Anderson ("Anderson"), Sgt. McKernan ("McKernan") (collectively, the "individual defendants") and the City of New York ("the City") have moved for partial summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiff Frank Standt ("Standt") opposes. For the reasons set forth below, the motion will be granted in part and denied in part.

### The Parties

Frank Standt is a citizen and resident of Germany.

Defendant City of New York is a municipality organized and existing under the laws of the State of New York.

At all times relevant to this action, Police Officers Tuozzolo and Applewhite, Sergeants Chu, Dempsey, Anderson, and McKernan, and John Does # 1–# 5 were police officers under the command of the 28th Precinct of the New York City Police Department ("NYPD").

### The Facts

Almost every material fact in this action is the subject of serious dispute, as set forth below. Rule 56 requires the facts to be construed in the light most favorable to the plaintiff in this summary judgment motion.

At approximately 1:05 a.m. on January 27, 1999, Standt was stopped at a NYPD traffic checkpoint at Mount Morris Park and West 123rd St. in New York City. (Compl. ¶¶ 9, 10; Maazel Decl. Ex. A (Standt Deposition) at 192:11–14.) He was driving a black 1994 Saturn automobile with a "gay pride" rainbow flag hanging from the rear view mirror. (Rosen Decl. Ex. J (Online Booking System Arrest Worksheet) at 34; Maazel Decl. Ex. A at 170; Standt Decl. ¶ 2.) At that time, Standt spoke English with a thick German accent and had difficulty understanding English. (Standt Decl. ¶ 10; Maazel Decl.

Exs. G (Dempsey Decl.) at 99, M (Chu Dep.) at 126, N (Parduba Dep.) at 47.)

Officer Tuozzolo approached the vehicle and asked Standt where he was coming from and where he was going. (Rosen Decl. Ex. N (Tuozzolo Deposition) at 159:18–23; Rosen Decl. Ex. E (Intoxicated Driver Examination Form) at 2; Standt Decl. ¶ 4.) Standt contends that he told Tuozzolo that he was coming from a friend's house and was on the way to another friend's house (Standt Decl. ¶ 4), but Tuozzolo alleges that Standt told him he didn't know either where he was coming from or where he was going. (Tuozzolo Dep. at 159:18–23; Rosen Decl. Ex. E.)

Tuozzolo asked Standt to show a drivers' license. Standt produced his German license, which contained the words "drivers license" in English, as well as his passport, from his trunk. (Maazel Decl. Ex. C.) The license did not have any expiration date, and Tuozzolo was unaware that New York law allows non-New York residents to drive with licenses issued by foreign countries. *See* N.Y. V.T.L. § 250(2); (Tuozzolo Dep. at 248:13–16, 259–60).

Tuozzolo avers that Standt had bloodshot eyes and was not wearing a seatbelt. (Tuozzolo Dep. at 148–50) Standt, on the other hand, does not believe his eyes were bloodshot and contends that he was wearing a seatbelt because the car he was driving has an automatic shoulder belt feature. (Standt Decl. ¶¶ 2, 5; Standt Dep. at 188.) Other officers who interacted with Standt at the checkpoint and at the police station did not observe him to have bloodshot eyes. (Maazel Decl. Exs. M (Chu Dep.) at 127, 167–68, N (Parduba Dep.) at 47–8, O (Tolan Dep.) at 76.)

Although Tuozzolo later admitted that Standt exhibited no signs of intoxication at any time during their encounter, Standt was asked to exit his car and walk a

straight line to complete a field sobriety test. (Tuozzolo Dep. at 572–74, 189–90, 500–02; Online Booking Sheet at 1. 17; Standt Dep. at 14:11–16.) Tuozzolo has alternately alleged that Standt failed to complete the test, and that he completed it but failed to walk "heel to toe" as required. (Tuozzolo Dep. at 183:4–9, 184:21–22, 188:4–12) Standt contends that he walked the straight line with no difficulty but was never instructed in the "heel to toe" method. (Standt Dep. at 14:17–19.)

After attempting the line walk, Standt was arrested and charged with driving under the influence of alcohol at approximately 1:10 a.m. (Tuozzolo Dep. at 290; Online Booking Sheet, 1. 9; Rosen Decl. Ex. D (28th Pct. Command Log); Standt Dep. at 34.) Sgt. Chu, the supervisor on the scene, alleges that Standt became agitated, started yelling in German and said "Heil Hitler." (Rosen Decl. Ex. P (Chu Dep.) at 132). Standt denies having said this or raised his voice at all, which Tuozzolo confirms. (Stand Dep. at 34–35; Standt Decl. ¶ 6; Tuozzolo Dep. at 573–74.)

Standt was transported to the 28th Precinct of the NYPD. When he arrived at the precinct, the desk sergeant, Victor Dempsey, did not notice Standt to have any signs of intoxication, such as smelling of alcohol, slurring his speech, being unsteady on his feet, or having bloodshot eyes. (Maazel Decl. Ex. G (Dempsey Dep.) at 99–104.) Nonetheless, Dempsey wrote in the command log that Standt appeared intoxicated. (Dempsey Dep. at 99–104; Command Log ("App Intox").) Dempsey also searched Standt's bag, which contained various gay-related magazines and other items. (Standt Dep. at 59–61, 197–203.)

Officer Parduba administered a breathalyzer test to Standt on the second floor of the precinct at approximately 2:35 a.m. Meanwhile, Tuozzolo began to fill out the appropriate paperwork. In the space for "Physical Condition" in the Online Booking Sheet, Tuozzolo wrote the code "01" for "Apparently Normal." (Maazel Decl. Ex. E 1. 17; Tuozzolo Dep. at 500–02.)[1] On the Intoxicated Driver Examination form, Tuozzolo checked boxes indicating that Standt's eyes were bloodshot and his balance was "swaying." (Rosen Decl. Ex. E (Intoxicated Driver Examination form) at 2.) While upstairs, officers including Tuozzolo directed repeated explicit homophobic remarks at Standt. (Standt Dep. at 86–9.) The breathalyzer test revealed that Standt had a blood alcohol level of 0.00%. (Rosen Decl. Exs. F (Chemical Test Analysis), G (Officer's Arrest Report—IDTU).) The DUI arrest was then voided. (Command Log.)

Still in handcuffs since his arrest, Standt was returned downstairs. Crying now, he asked repeatedly to contact the German Consulate. (Standt Dep. at 94–5, 98–100, 104–07.) No officer either notified him of his right to contact the Consulate or allowed him to do so at any time. (Standt Dep. at 100–01, 104–07; Standt Decl. ¶ 9; Tuozzolo Dep. at 404–07.)

When Standt requested that his handcuffs be loosened, an officer tightened them instead, and Standt alleges that officers began to assault him by pulling his hair, hitting him in the shoulders, ribs, and stomach. (Standt. Dep. at 108–17.) The defendants contest this charge, and specifically contend that Officer Tuozzolo attempted to remove the cuffs once the DUI charge was voided, but that Standt "re-

---

1. The "0" appears to be written over with a "1," giving the appearance of a "11" code, which stands for "Intox Drugs." There is no allegation that Standt manifested any sign of drug use. Tuozzolo cannot explain this discrepancy, other than to guess that he put a "slash" through the zero. (Tuozzolo Decl. at 502.)

fused to be released,"twisted and moved away, began to scream, and attempted to bite him. (Tuozzolo Dep. at 378–79; Tuozzolo memo book).

At or about 3:16 a.m., Sgt. Dempsey ordered Standt to be transported to St. Lukes Hospital as an alleged Emotionally Disturbed Person ("EDP"). (Dempsey Dep. at 131–34, 140.) Upon arrival, Nurse Mary Swett ("Swett") determined that Standt was not emotionally disturbed in any way. (Standt Dep. at 142, 248–49; Tuozzolo Dep. at 460–62; Maazel Decl. Ex. H (Tuozzolo Memo Book) at 4 ("ASS[t.] Head Nurse Nary Swett St. Lukes Hosp. Refused to Do Write up Not EDP").) Standt asked Swett to contact the German Consulate, which she did. Standt spoke briefly to an individual at the Consulate by telephone. (Standt Dep. at 236.)

At approximately 4:30 a.m., Standt, who was still handcuffed, was transported back to a parking lot across from the 28th Precinct station house, where he alleges that he was again beaten by several police officers. (Standt Dep. at 273–82.) Tuozzolo issued Standt two summonses—one for driving without a seatbelt and the other for driving without a valid license—before releasing him. (Standt Decl. ¶ 8; Maazel Decl. Ex. K (summonses).) The summonses had been sworn at approximately 2:45 a.m.—after the breathalyzer test came back negative. (Maazel Decl. Ex. H (Tuozzolo memo book)), but Standt was not notified of them until after 4:30 a.m. (Standt Decl. ¶ 8). He was finally released at approximately 4:39 a.m., more than three hours after he was stopped at the checkpoint. (Tuozzolo memo book.)

Standt then returned to St. Luke's Hospital in order to seek treatment for injuries he had received that night. (Standt Dep. at 293–95; Maazel Decl. Ex. I (St. Luke's Hospital Records)). He alleges that his treatment by officers brought back memories of his brutal detention and imprisonment by the East German STASI police when he lived in East Germany. (Compl.¶ 57.)

Standt retained an attorney and appeared in traffic court two or three times before both summonses were dismissed. (Maazel Decl. ¶ 3; Standt Decl. ¶ 8.)

### Procedural History

After duly serving notices of claim pursuant to New York law and receiving no offer of settlement, Standt filed this action against the City, Tuozzolo, and John and Jane Does # 1–# 10 on November 3, 1999. An amended complaint adding Applewhite, Chu, Dempsey, Anderson, and McKernan, and reducing number of John Does, was filed on February 20, 2001. The amended complaint contains ten claims: (1) a 42 U.S.C. § 1983 cause of action for conspiracy to violate, and actual violations of Standt's Fourth, Fifth, Sixth, and Fourteenth Amendment rights, by the individual defendants; (2) violations of the Article I, § 2 of the New York State Constitution; (3) assault and battery; (4) false arrest and false imprisonment; (5) Intentional Infliction of Emotional Distress; (6) Malicious Prosecution; (7) Conversion/Unjust enrichment of a watch and bracelet; (8) Article 36(1) of the Vienna Convention on Consular Relations, (9) negligence with regard to the watch and bracelet, each against all defendants; and (10) negligent hiring/training/retention of employment services by the City.

The defendants filed this partial summary judgment motion on March 13, 2001. Specifically, the defendants seek summary judgment on (1) the Vienna Convention claim; (2) the false arrest and false imprisonment claim due to (a) the existence of probable cause and (b) qualified immunity;

and (3) the malicious prosecution claim.[2] Standt filed opposing papers on April 9, 2001, and the motion was deemed fully submitted upon oral argument on May 2, 2001.

### Discussion

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues— where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

While all reasonable ambiguities and inferences should be resolved against the moving party, those inferences must be supported by affirmative facts and must be based on relevant, admissible evidence. *See* Fed.R.Civ.P. 56. A party seeking to defeat a summary judgment motion cannot " 'rely on mere speculation or conjecture as to the true nature of facts to overcome the motion.' " *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995) (citation omitted).

### II. The Vienna Convention Claim

Defendants allege that Standt cannot pursue his § 1983 claim for violation of his right to consular notification under the Vienna Convention on Consular Relations ("VCCR" or "Vienna Convention"), April 24, 1963, 21 U.S.T. 77, 101 T.I.A.S. No. 6820, 596 U.N.T.S. 261, 1967 WL 18349, because (1) Standt does not have standing to bring suit for violations of the VCCR, as that treaty does not provide an individual right of action; (2) VCCR violations are not actionable pursuant to 42 U.S.C. § 1983; and (3) even if he does have a cognizable claim, he cannot show the prejudice required to claim damages.

### A. The VCCR Provides a Private Cause of Action That Individuals Such as Standt May Enforce

■ The VCCR came into force on April 24, 1964, and was ratified by the individual defendants, not the City. (Compl. at 8 ("First Cause of Action: 42 U.S.C. § 1983/Constitutional Claims, Against Individual Defendants").)

---

**2.** The motion also seeks summary judgment on the "42 U.S.C. § 1983 [claim] against the City." (Def. Br. at ii.) However, as set forth above, the only § 1983 claim is against the

United States on October 22, 1969. *See* Cong. Rec. 30997 (1969). Although international treaties, as agreements among nations, rarely grant rights that may be enforced by an individual, there are exceptions to this rule. *See United States v. Alvarez–Machain,* 504 U.S. 655, 667–68, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992); *Head Money Cases,* 112 U.S. 580, 598, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884). The Supreme Court has recognized generally that an individual may assert private rights under a treaty if the treaty either expressly or impliedly provides for a private right of action, *see Argentine Republic v. Amerada Hess Ship. Corp.,* 488 U.S. 428, 442, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989), and has noted that the Vienna Convention in particular "arguably confers on an individual the right to consular assistance following arrest," *Breard v. Greene,* 523 U.S. 371, 376, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998). However, the Supreme Court has not directly addressed whether the "right to consul" may be asserted in United States courts, the mechanism by which it may be raised, or the appropriate remedy for its violation.

The threshold issue—often subsumed under the doctrines of "standing" and "self-executing" treaties—is whether the VCCR confers a private right of action enforceable by individuals. *See, e.g.,* Car-

los Manuel Vazquez, *Treaty–Based Rights and Remedies of Individuals,* 92 Colum. L. Rev. 1082, 1135 (June 1992) (hereinafter "Vazquez") (in treaty cases, the issue of standing and the question "whether the individual has a 'right' under the treaty such that the treaty may be said to be self-executing ... in fact address the same issue and should be collapsed."); *cf. National Railroad Passenger Corp. v. National Assn. of Railroad Passengers,* 414 U.S. 453, 455–56, 94 S.Ct. 690, 692, 38 L.Ed.2d 646 (1974) (although questions of "standing" and whether statute "can be read to create a private right of action to enforce compliance with its provisions" are "interrelated," the "threshold question clearly is whether the [statute] ... creates a cause of action whereby a private party such as the respondent can enforce duties and obligations imposed by the Act.").[3]

Lower "[c]ourts have been unable to reach a consensus, and often even a decision, on the issue[ ] of whether Article 36 creates an individually enforceable right." *United States v. Santos,* 235 F.3d 1105, 1107 (8th Cir.2000). Many courts have avoided "wad[ing] into the morass" by presuming that a private right of action exists. *United States v. Salameh,* 54 F.Supp.2d 236, 279 (S.D.N.Y.1999). *See, e.g., United States v. Lawal,* 231 F.3d 1045, 1048 (7th

---

**3.** Courts have assessed whether a treaty is "self-executing" in several ways, including, most commonly, asking whether the treaty creates a private right of action, *see, e.g., Columbia Marine Services, Inc. v. Reffet Ltd.,* 861 F.2d 18, 21 (2d Cir.1988) (to be "self-executing," treaty "must prescribe[ ] rules by which private rights may be determined."), or requires Congress to pass implementing legislation before the treaty may take effect, *see Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829); *Dreyfus v. Von Finck,* 534 F.2d 24, 30 (2d Cir.1976), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976). The VCCR is recognized to be self-executing. *See Breard v. Pruett,* 134 F.3d 615,

622 (4th Cir.1998) (Butzner, J. concurring) ("The Vienna Convention is a self executing treaty—it provides rights to individuals rather than merely setting out the obligations of signatories."), *cert. denied,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998); S. Exec. Rep. No. 91–9, app., at 5 (statement of J. Edward Lyerly, Deputy Legal Adviser for administration, that the United States considers the VCCR "entirely self-executive," and requiring no Congressional implementing legislation); Restatement (Third) Foreign Relations Law of the United States § 111 cmt. h (1986) (Executive Branch statements regarding treaties carry great weight in determining whether the treaty is self-executing).

Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1165, 148 L.Ed.2d 1024 (2001); *United States v. Cordoba–Mosquera,* 212 F.3d 1194, 1196 (11th Cir.2000) (per curiam), *cert. denied sub. nom Zuniga v. United States,* —— U.S. ——, 121 S.Ct. 893, 148 L.Ed.2d 800 (2001); *United States v. Li,* 206 F.3d 56, 60 (1st Cir.2000), *cert. denied,* 531 U.S. 956, 121 S.Ct. 378, 148 L.Ed.2d 292 (2000); *United States v. Lombera–Camorlinga,* 206 F.3d 882, 885 (9th Cir. 2000) (en banc), *cert. denied,* 531 U.S. 991, 121 S.Ct. 481, 148 L.Ed.2d 455 (2000); *United States v. Bin Laden,* 132 F.Supp.2d 168, 194 & n. 30 (S.D.N.Y.2001); *Sorensen v. City of New York,* Nos. 98 Civ. 3356(HB), 98 Civ. 6725(HB), 2000 WL 1528282, *3 (S.D.N.Y. Oct. 16, 2000); *United States v. Rodrigues,* 68 F.Supp.2d 178, 183 (S.D.N.Y.1999); *United States v. Kevin,* No. 97 CR. 763 JGK, 1999 WL 194749, *3 (S.D.N.Y. Apr. 7, 1999).

Interpretation of treaties is governed by the Vienna Convention on the Law of Treaties ("Treaty Convention"), May 23, 1969, art. 26, 1155 U.N.T.S. 331, 339,[4] which directs courts to look first to the plain language of a treaty when attempting to determine its meaning. *See Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ("Interpretation of [the Treaty] must, of course, begin with the language of the Treaty itself[, and] [t]he clear import

of Treaty language controls. . . ."); *Croll v. Croll,* 229 F.3d 133, 136 (2d Cir.2000).

Article 36 of the Vienna Convention enumerates the right of consular notification as follows:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending state: . . .

(b) if [the defendant] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of *his rights* under this subparagraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. . . .

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the

---

**4.** Plaintiff argues that the standing question must be determined by reference to the analytical framework for statutory construction set forth in *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). In *Freestone,* the Court employed a three-part test to establish whether a statute provided a federal right: (1) Congressional intent to establish an individual right; (2) the right asserted is specific enough to be enforced by the judicial system; and (3) the statute "must unambiguously impose a binding obligation on the states." 520 U.S. at 340–41, 117 S.Ct. at 1359. The presence of all three factors

creates a rebuttable presumption that the statute creates an enforceable federal right. *Id.,* 520 U.S. at 341, 117 S.Ct. 1353, 137 L.Ed.2d 569. Although statutes and treaties share the same legal rung in the American hierarchy of laws, *see Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888), *Freestone* applies to statutes, not treaties. Nonetheless, as set forth below, its three factors are relevant to the Treaty Convention analysis, with the exception that the Congressional intent factor is replaced by the intent of the treaty's drafters, and then only if the plain language of the treat is ambiguous. *See infra.*

proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

VCCR, Art. 36 (emphasis added). This "text emphasizes that the right of consular notice and assistance is the citizen's. The language is mandatory and unequivocal, evidencing the signatories' recognition of the importance of consular access for persons detained by a foreign government." *Breard v. Pruett*, 134 F.3d 615, 622 (4th Cir.1998) (Butzner, J., concurring), *cert. denied*, 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998); *see also United States v. Hongla–Yamche*, 55 F.Supp.2d 74, 77 (D.Mass.1999) ("The language of Article 36 clearly refers to the existence of an individual right."). Indeed, it is difficult to imagine "how it is possible to frame language that more unequivocally establishes that the protections of Article 36(1)(b) belong to the individual national, and that the failure to promptly notify him/her of these rights constitutes a violation of these entitlements by the detaining authority." *Li*, 206 F.3d at 72 (Toruella, J., concurring in part and dissenting in part).

Defendants argue that the Preamble to the VCCR undermines this interpretation. The Preamble states that "the purpose of such privileges and immunities [set forth herein] is not to benefit individuals, but to ensure the efficient performance of functions by consular posts on behalf of their respective States." VCCR, Preamble. However, when taken in the context of the treaty as a whole, the Preamble's reference to "individuals" is best understood as referring to consular officials rather than civilian foreign nationals. *See Rodrigues*, 68 F.Supp.2d at 182 ("it appears that the

purpose of [the Preamble] is not to restrict the individual notification rights of foreign nationals, but to make clear that the Convention's purpose is to ensure the smooth functioning of consular posts in general, not to provide special treatment for individual consular officials."); Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul*, 18 Mich. J. Int'l L. 565, 594 (Summer 1997) (hereinafter "Kadish") ("The privileges and immunities granted in the Vienna Convention are to enable to consul to perform his enumerated functions, not to benefit the consul personally. Thus, the preamble language refers to the individual consul, not individual foreign nationals.").

Even if the Preamble were directed to civilian individuals, the direct conflict with the clear meaning of Article 36 would merely create an ambiguity in the Treaty language and force the Court to refer to outside interpretive sources such as the travaux preparatories[5] and operation of the treaty in practice pursuant to the canons of treaty construction. *See Croll*, 229 F.3d at 136 ("Where the text—read in the context of its structure and purpose—is ambiguous, we may resort to extraneous tools of interpretation such as a treaty's ratification history and subsequent operation.") (*citing Sumitomo*, 457 U.S. at 180, 102 S.Ct. 2374). Each of these texts affirms the interpretation that the VCCR was intended to confer individual rights.

First, committee and plenary meeting debates on the VCCR reflect widespread concern with the question of individual rights. For example, a proposed amendment by Venezuela that would have eliminated the individual right of consular communication was withdrawn after receiving

---

**5.** The travaux preparatories, or pre-enactment debates between representatives of member countries, effectively function as a treaty's "legislative history." *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1350, 1362 (2d Cir.1992).

strong opposition from other member states. 2 United Nations Conference on Consular Relations: Official Records, at 37, 38, 84, 85, 331–34, U.N. Doc. A/Conf. 2⅚, U.N. Sales. No. 63.X.2 (1963) (hereinafter "Official Records"). The United States, in particular, proposed language intended to "protect the rights of the national concerned." *Id.* at 337. In short, "the 'legislative history' of the Treaty supports the interpretation that Article 36 was intended to confer individual rights on foreign nationals." Kadish, 18 Mich. J. Int'l L. at 599.

Second, in amicus briefs filed in criminal actions in the United States, other countries have recognized that the VCCR creates a private right of notification for detained individuals. *See, e.g., Breard v. Netherland,* 949 F.Supp. 1255 (E.D.Va. 1996) (Paraguay and Argentina), *aff'd sub nom Breard v. Pruett,* 134 F.3d 615 (4th Cir.1998), *cert. denied, Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998); *Faulder v. Johnson,* 81 F.3d 515 (5th Cir.1996) (Canada), *cert. denied,* 519 U.S. 995, 117 S.Ct. 487, 136 L.Ed.2d 380 (1996); *Ohio v. Loza,* 71 Ohio St.3d 61, 641 N.E.2d 1082 (1994) (Mexico), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1983, 131 L.Ed.2d 871 (1995); *Murphy v. Commonwealth,* 246 Va. 136, 431 S.E.2d 48 (1993) (Mexico), *cert. denied,* 510 U.S. 928, 114 S.Ct. 336, 126 L.Ed.2d 281 (1993). Notably, Germany invoked the VCCR in a suit filed in Virginia to enjoin the imposition of the death penalty against a German citizen who was not notified of his VCCR right to consular notification. *See Federal Republic of Germany v. United States,* 526 U.S. 111, 119 S.Ct. 1016, 143 L.Ed.2d 192 (1999).

The rights of consular notification and consultation enumerated in the VCCR are reinforced by federal regulations designed to implement these treaty obligations, as well as periodic official missives to the states. In particular, Title 28, Code of Federal Regulations, Section 50.5, states that "[i]n every case in which a foreign national is arrested the arresting officer shall inform the foreign national that his consul will be advised of his arrest unless he does not wish such notification to be given." 28 C.F.R. § 50.5(a)(1). The CFR requires the arresting agent to "inform the nearest U.S. Attorney of the arrest and of the arrested person's wishes regarding consular notification." *Id.* § 50.5(a)(2). The U.S. Attorney must then "notify the appropriate consul except where he is informed that the foreign national does not desire such notification to be made." *Id.* § 50.5(a)(3). *See also* 8 C.F.R. § 242.2(g) (requiring INS to notify every detained alien of right to communicate with consul).

Notably, the United States State Department, which was assigned to enforce the VCCR, sends regular notices to state and local officials reminding them of their notification obligations under the Treaty. *See* Kadish, 18 Mich. J. Int'l L. at 599 & nn. 211–214 (citing *Breard v. Netherland,* 949 F.Supp. 1255 (E.D.Va.1996), Exs. A, B. ("This is to remind all personnel with law enforcement responsibilities that the U.S. is obligated under international agreements and customary international law to notify foreign authorities when foreign nationals are arrested or otherwise detained in the U.S.")); *Haitian Ctrs. Council, Inc. v. McNary,* 969 F.2d 1350 (2d Cir.1992) (Executive Branch's interpretation of treaty is entitled to great weight).[6]

---

**6.** However, in a subsequent death penalty case in Virginia, the State Department and Justice Department informed the court that "the Vienna Convention [was not] intended to create a judicial remedy for alleged violations or to create legal rights for individuals." Kadish, 18 Mich. J. Int'l L. at n. 221 (quoting appellate brief in *Republic of Paraguay v. Al-*

The United States has repeatedly invoked Article 36 on behalf of American citizens detained abroad who have not been granted the right of consular access. *See United States v. Superville,* 40 F.Supp.2d 672, 676 & n. 3 (D.Vi.1999) (noting United States interventions in Iran in 1979 and Nicaragua in 1986). As the *Superville* court noted,

> Under the fundamental principle of *pacta sunt servanda,* which states that "treaties must be observed," the United States has consistently invoked the Vienna Convention to protest other nations' failures to provide Americans with access to consular officials. This basic principle also requires, of course, that the United States respect its obligations under the treaty. Reciprocity is the foundation of international law.

*Id.* at 676 (*citing Pruett,* 134 F.3d at 622 (Butzner, J. concurring)). It is critical for the judiciary to recognize VCCR rights of foreign nationals detained in the United States for the United States to continue its success in invoking the Vienna Convention on behalf of U.S. citizens detained abroad.

In sum, the language of the VCCR, coupled with its "legislative history" and subsequent operation, suggest that Article 36 of the Vienna Convention was intended to provide a private right of action to individuals detained by foreign officials. *See, e.g., Rodrigues,* 68 F.Supp.2d at 183 (reasoning, but not holding, that "the better reading of the treaty is that a foreign national does have standing to assert his or her right to consular notification under Article 36 of the Convention.").[7] As a foreign national detained by United States authorities without consular notice, Standt has standing to pursue a Vienna Convention claim.

## B. Standt May Pursue an Affirmative Claim for Violation of his VCCR Rights Pursuant to 42 U.S.C. § 1983

The VCCR, as a ratified treaty, "is of course 'the supreme law of the land.'" *Ackermann v. Levine,* 788 F.2d 830, 838 (2d Cir.1986) (quoting U.S. Const. Art. VI, cl. 2); *see also Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888) ("By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation."). Title 42, United States Code § 1983 "imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws'" of the United States. *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (quoting 42 U.S.C. § 1983 (1996)). As set forth above, the VCCR gives individuals a right to consular notification in the event of arrest or detention. The Supreme Court "[does] not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wright v. City of Roanoke Redevelopment*

---

*len,* 949 F.Supp. 1269 (E.D.Va.1996) and citing argument in *Breard v. Netherland,* 949 F.Supp. 1255 (E.D.Va.1996)). *See also Li,* 206 F.3d at 63–66 (citing examples of State Department statements interpreting VCCR as not conferring an individual right). However, the litigation position of the State Department may not be entitled to as great weight as its nonlitigation policy approach to interpreting the VCCR, particularly due to the conflict between the two. *See id.,* 206 F.3d at 73–75

& n. 4 (Toruella, J., concurring in part and dissenting in part).

7. Defendants construe *Rodrigues* as "affirm[ing] that individuals do not have standing under the VCCR, but rather holds that the VCCR was intended to confer rights on consular officials. *Rodrigues* [sic], 68 F.Supp.2d at 182." (Def. Reply Br. at 5–6.) Reference to the text of *Rodrigues* demonstrates that defendants' analysis is erroneous.

*and Hous. Auth.,* 479 U.S. 418, 423–24, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (quotation omitted).

The VCCR is most often addressed in the context of criminal cases, where courts have almost uniformly declined to suppress evidence or to dismiss an indictment for foreign national defendants as a result of VCCR violations. *See, e.g., United States v. Page,* 232 F.3d 536, 541 (6th Cir.2000) (*citing Li,* 206 F.3d 56; *Lombera–Camorlinga,* 206 F.3d 882; *Cordoba–Mosquera,* 212 F.3d 1194); *see also Lawal,* 231 F.3d at 1048. *But see Ledezma v. State,* 626 N.W.2d 134 (Iowa 2001) (trial counsel rendered ineffective assistance of counsel, *inter alia,* when he failed to inform the defendant of his right to consular access under Article 36 of the VCCR); *State v. Reyes,* 740 A.2d 7, 13–14, *reargument denied,* 1999 WL 743598 (Del.Super.1999) (granting a motion to suppress evidence because failure to advise defendant of his rights under Article 36 of the VCCR precluded an intelligent waiver of *Miranda* rights).

In *Waldron v. INS,* 17 F.3d 511 (2d Cir.1993), the Second Circuit recognized that "Article 36 of the [Vienna] Convention provides, *inter alia,* that aliens shall have the freedom to communicate with consular authorities of their native country," and that "compliance with our treaty obligations clearly is required," but nonetheless denied a detained alien's petition seeking to reverse a Board of Immigration Appeals decision to deport him, and "decline[d] to equate such a provision with fundamental rights, such as the right to counsel, which traces its origins to concepts of due process." 17 F.3d at 518.

Defendants cite *Waldron* for the proposition that a § 1983 action is not available to Standt because the VCCR did not establish a fundamental or constitutional right. (Def. Br. at 5–6.) The distinction between fundamental or constitutional rights and lesser rights is relevant in the context of habeas corpus petitions, immigration appeals, and criminal actions, because in those contexts, only the deprivation of a fundamental constitutional right justifies the "drastic remedy" of suppressing probative evidence or releasing an individual from custody after a prior adversarial proceeding. *Salameh,* 54 F.Supp.2d at 277; *see also Li,* 206 F.3d at 63 ("these remedies are reserved for extraordinary encroachments upon the most fundamental individual rights."). *See, e.g., Cuyler v. Sullivan,* 446 U.S. 335, 342–43, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980) ("A state prisoner can win a federal writ of habeas corpus only upon a showing that the State participated in the denial of a fundamental right protected by the Fourteenth Amendment."); *Waldron,* 17 F.3d 511, 518 ("when a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid and a remand to the agency is required ... On the other hand, where an INS regulation does not affect fundamental rights derived from the Constitution or a federal statute, we believe it is best to invalidate a challenged proceeding only upon a showing of prejudice to the rights sought to be protected by the subject regulation."); *Rodrigues,* 68 F.Supp.2d at 185 ("[A]s the effect of [suppression] is the loss of relevant and probative evidence, this remedy is not applied for every violation of federal law but is reserved only for breaches of the most basic constitutional rights.").

However, as the Supreme Court recognized in *Freestone,* § 1983 provides a cause of action to redress the deprivation "of *any* rights ... secured by the Constitution and laws" of the United States, not only fundamental or constitutional rights.

520 U.S. at 340, 117 S.Ct. 1353 (quoting 42 U.S.C. § 1983) (emphasis added). *See, e.g., Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (no fundamental right to government employment); *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 29–39, 93 S.Ct. 1278, 1294–1300, 36 L.Ed.2d 16 (1973) (no fundamental right to education); *Mrs. W. v. Tirozzi,* 832 F.2d 748, 759 (2d Cir.1987) (holding that § 1983 is appropriate vehicle to assert violations of the Education of the Handicapped Act ("EHA")). Therefore, whether the rights established by the VCCR are "fundamental" or not is a question that has no bearing here, and *Waldron* does not bar this Court from holding that Standt may pursue a § 1983 claim for violation of his right to consular notification under the VCCR.

It appears that only one other case has addressed the question whether the VCCR creates a cognizable § 1983 action.[8] In *Sorensen v. City of New York,* Nos. 98 Civ. 3356(HB), 98 Civ. 6725(HB), 2000 WL 1528282, *3 (S.D.N.Y. Oct. 16, 2000), plaintiffs filed a § 1983 action asserting damages for violation of the VCCR after the plaintiff was arrested and imprisoned without the benefit of consular notification. The Honorable Harold Baer, Jr. analogized to the criminal suppression cases, and presumed, without directly addressing, that the defendant had standing to seek a remedy for violation of his VCCR rights. After exploring the reasoning of the criminal cases, discussing the *Waldron* decision, and considering the availability of civil damages for Article 36 violations in other nations, the *Sorensen* court held that the

VCCR provides no private right of action for money damages under § 1983 because "the Vienna Convention, by its terms, does not require that such violation be redressed by money damages." 2000 WL 1528282, at *6.

For the reasons set forth above, neither the reasoning of *Waldron* nor that of the criminal cases is dispositive here. The remedy of civil damages for a plaintiff who alleges he was unlawfully detained without consular notification is much less "drastic" than suppressing incriminatory evidence or dismissing an indictment against a properly charged criminal defendant.

On the other hand, the Vienna Convention's lack of an enumerated remedy for civil damages—or any remedy at all—bears further discussion. The *Sorensen* court reasoned that the lack of specified remedy, coupled with other nations' failure to provide a civil damages remedy for Article 36 violations, led to the conclusion that civil damages are not available. 2000 WL 1528282, at *6–*7. Yet the Vienna Convention does specify that the right of consular notification "shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended." VCCR, art. 36(2). "As with federal statutes, it is not unusual for 'substantive rights [to] be defined by [treaty] but the remedies for their enforcement left undefined or relegated wholly to the states.'" Vazquez, 92 Colum. L. Rev. at 1144 (quoting Hart & Wechsler, The Federal Courts and the

---

8. Although a court in the Central District of Illinois recently noted that "[n]o court has addressed the issue in context of a civil claim for monetary damages," *Jogi v. Piland,* 131 F.Supp.2d 1024, 1026 (C.D.Ill.2001), *Sorensen* was issued in unpublished form on October

16, 2000. *See also Salazar v. Burresch,* 47 F.Supp.2d 1105, 1114 (C.D.Cal.1999) (granting summary judgment and dismissing § 1983 action for violation of the VCCR for lack of a genuine issue of material fact without addressing standing or remedy issues).

Federal System 533 (1988)). That a cause of action for civil damages similar to 42 U.S.C. § 1983 is not available in other countries does not change the fact that such an action is a part of the "laws and regulations" of the United States.

### C. Plaintiffs Asserting § 1983 Claims for VCCR Violations Must Show Injury Rather than Prejudice

■ Defendants contend that it is "well settled" that Standt must show prejudice in order to proceed with his § 1983 claim, (Def. Reply Br. at 3), and that summary judgment should be granted on the VCCR claim because Standt cannot meet this standard. Yet the prejudice requirement was developed in the criminal and immigration contexts, and is not applicable here for the same reasons already discussed. Instead, as in other § 1983 contexts, a plaintiff bringing suit under the VCCR need only show that the violation injured him.

In criminal suppression and deportation contexts, the party seeking relief must demonstrate that the violation of his non-fundamental rights prejudiced him, or, in other words, that the outcome of the adversarial proceeding against him would have been different. *See, e.g.,* In *Breard v. Greene,* for example, the Supreme Court reasoned that:

> [e]ven were Breard's Vienna Convention claim properly raised and proved, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial ... Breard's asserted prejudice—that had the Vienna Convention been followed, he would have accepted the State's offer to forgo the death penalty in return for a plea of guilty—is far more speculative than the claims of prejudice courts routinely re-

ject in those cases were an inmate alleges that his plea of guilty was infected by attorney error.

523 U.S. at 377, 118 S.Ct. at 1355, 140 L.Ed.2d at 538. *See also Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068 80 L.Ed.2d 674 (1984) (defining outcome-determinative test for prejudice); *Santos,* 235 F.3d at 1107 (holding that criminal defendant must show prejudice to justify suppression as remedy for VCCR violation); *Waldron,* 17 F.3d at 518 (no relief from deportation order without showing prejudice). The prejudice requirement seeks to balance the need for a fair criminal trial process with the constraints of judicial economy where a defendant's liberty is at stake. *See, e.g., Hill v. Lockhart,* 474 U.S. 52, 57–8, 106 S.Ct. 366, 369–70, 88 L.Ed.2d 203 (1985). Thus, the Second Circuit has explained that *Waldron* "requires that a petitioner must demonstrate that the failure to afford the privilege of communication [under an INS regulation enacted pursuant to the VCCR] 'prejudiced [petitioner] in his preparation of a defense to the deportation charges.'" *Douglas v. INS,* 28 F.3d 241, 246 (2d Cir. 1994) *(citing Waldron,* 17 F.3d at 519).

■ In contrast, prejudice need not be shown in § 1983 actions, which seek monetary damages for unlawful acts committed under color of state law, rather than a remedy which will compromise the validity or possibility of a conviction. Such a requirement would be impossible to meet in the circumstances presented here, where the plaintiff in fact *prevailed* at an adversarial hearing. More importantly, it has been clearly established that a § 1983 plaintiff must assert merely that he was "injured" in order to pursue a § 1983 claim. 42 U.S.C. § 1983; *see Texas v. Lesage,* 528 U.S. 18, 20, 120 S.Ct. 467, 468, 145 L.Ed.2d 347 (1999) (plaintiff may not pursue § 1983 action absent "cognizable

injury"). Pronouncements that "courts have unanimously held that in order for a foreign national to win relief for a Convention violation, he or she must show that the lack of consular notification prejudiced his or her case," *Rodrigues,* 68 F.Supp.2d at 183, overlook the fact that every court to have addressed whether the VCCR includes a prejudice requirement has done so in the context of a criminal or immigration case, not a § 1983 action.[9]

The amended complaint alleges that Standt was injured as a result of the violation of his VCCR right to consular notification. (Compl.¶¶ 117.) Defendants argue that Standt cannot maintain the claim because he in fact conferred with a representative from the German Consulate prior to his release. (Def. Br. at 10 ("any alleged prejudice would be harmless in any event").) However, aside from that fact that Standt was granted access to his consulate from a nurse at St. Luke's Hospital *despite* the defendants, the defendants' legal arguments are not facts. The defendants have failed to introduce evidence to create a genuine issue of fact on the question of Standt's injury.

The complaint alleges that the defendants deprived Standt of his rights under the Vienna Convention by failing to allow him to communicate with a representative of the German Consulate, thereby causing him damages in violation of 42 U.S.C. § 1983. As the Vienna Convention confers a private right of action on persons in Standt's situation, which may be pursued in the United States through the vehicle of § 1983 "in conformity with the laws" of the United States, VCCR, art. 36(2), defendants' motion for summary judgment on this claim is denied.

## III. *Summary Judgment is Denied as to the False Arrest and Imprisonment Claims*

Defendants seek summary judgment on the false arrest and imprisonment claim on the grounds that (1) there was probable cause to arrest Standt, and (2) the individual defendants are protected by the doctrine of qualified immunity. *See Calamia v. City of New York,* 879 F.2d 1025, 1035–36 (2d Cir.1989) (holding that qualified immunity applies to both state law and section 1983 claims). Neither argument is sufficient to divert this claim from a jury.

### A. *Probable Cause*

 Probable cause exists when officers "have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999) (*quoting Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996)). The test for probable cause is objective; the officer's subjective belief at the time of arrest is irrelevant. *See, e.g., Martinez v. Simonetti,* 202 F.3d 625, 633 (2d Cir.2000) (*citing Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 1700, 143 L.Ed.2d 818 (1999)). The Supreme Court has recently held that a police officer may arrest a suspect based on probable cause to believe he has committed no more than a minor traffic offense. *Atwater v. City of Lago Vista,* 531 U.S. 990, 121 S.Ct. 1536, 1557, 149 L.Ed.2d 549 (2001).

Every material fact pertaining to the existence of probable cause to arrest Standt is disputed. Tuozzolo alleges he

---

**9.** As it held that the plaintiff could not maintain a § 1983 action for the violation of VCCR right to consular notification under the plain

language of the Treaty, the *Sorensen* court did not reach the prejudice question.

did not see Standt wearing a seatbelt, in clear violation of the seatbelt law. Standt says he was wearing one—and that the vehicle was equipped with an automatic shoulder belt feature. Tuozzolo alleges that Standt's eyes were bloodshot and that he failed to walk a straight line with heel to toe. *See, e.g., People v. Blajeski,* 125 A.D.2d 582, 509 N.Y.S.2d 648 (N.Y.App. Div.1986) (bloodshot eyes and field sobriety test results, *inter alia,* established probable cause to arrest the defendant for driving while intoxicated). Standt avers that his eyes were not bloodshot, that he walked the straight line but was never told to walk it in the "heel to toe" method.

Finally, Tuozzolo contends that he had probable cause to arrest Standt because he had no way of verifying the validity of Standt's German driver's license. *See People v. Watson,* 177 A.D.2d 676, 676, 576 N.Y.S.2d 370, 370 (N.Y.App.Div.1991) ("Driving without a license is a traffic infraction which justifies a police officer's immediate arrest of the unlicensed operator. *See* Vehicle and Traffic Law § 509."), *appeal denied,* 79 N.Y.2d 954, 592 N.E.2d 816, 583 N.Y.S.2d 208 (N.Y.1992) (table). It is undisputed that Standt is a German citizen and resident who provided a German driver's license upon request. New York law allows nonresidents to drive on its roads with licenses issued abroad. Specifically, the Vehicle and Traffic Law provides:

> A person of the age of sixteen years and upwards who shall be a nonresident of this state, and a resident of a state, territory, federal district or foreign country having laws, with which such person has complied, which require such person, in order to operate a motor vehicle or motorcycle therein, to be licensed, may operate or drive a motor vehicle or motorcycle on the public highways of this state without being so licensed under this chapter . . . .

N.Y. V.T.L. § 250(2). Standt avers that his license was valid.

However, the relevant inquiry is not whether the license was in fact valid, but whether the facts as known to Officer Tuozzolo at the time of the stop would lead a reasonable officer to believe a violation of the traffic laws was in progress. *See, e.g., Ricciuti v. New York City Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997). Defendants aver that an officer's inability to determine whether a foreign license was valid at the scene of a traffic stop gives rise to probable cause to arrest. (Def. Br. at 12.) Yet such a rule would enable the detention of all nonresident drivers on New York roads with passport in languages that police officers are unable to comprehend and eviscerate § 250(2) of the Vehicle and Traffic Law. Therefore, without more, Tuozzolo's inability to verify the validity of Standt's license on the scene did not give rise to probable cause to arrest him or issue a summons for driving without a license.

In short, there is a genuine issue of material fact as to whether a reasonable officer would have believed that Standt was violating New York's traffic laws. It is premature to determine whether probable cause existed.

### B. *Qualified Immunity*

■ Qualified immunity insulates a police officer from liability for civil rights violations committed in the course of duty if (1) the officer believed in good faith that his conduct was lawful; and (2) it was objectively reasonable for him to believe that his actions did not violate an arrestee's rights in light of clearly established law and the information available to the officer at the time of the arrest. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987);

*Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) ("The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions.") (internal quotation marks omitted). An officer's actions will be found objectively unreasonable, and summary judgment will be denied only if "no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995).

In *Saucier v. Katz,* 531 U.S. 991, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001), the Supreme Court recently reiterated that not every error deprives an officer of qualified immunity, because "reasonable mistakes can be made as to the legal constraints on particular police conduct." 121 S.Ct. at 2158; *see also Anderson,* 483 U.S. at 640, 107 S.Ct. at 3040 ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable."). Thus, "even if a court were to hold that the officer violated the Fourth Amendment ..., *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Saucier,* 121 S.Ct. at 2158–59.

An arresting officer is entitled to qualified immunity from a claim for false arrest and imprisonment if "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Lennon v. Miller,* 66 F.3d 416, 424 (2d Cir.1995) (*quoting Wachtler v. County of Herkimer,* 35 F.3d 77, 80 (2d Cir.1994)).

This "route to exoneration ... has its principal focus on the particular facts of the case" and can lead to summary judgment if the defendant "adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]" to believe that he acted in violation of an established federally protected right. *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (*quoting Halperin v. Kissinger,* 807 F.2d 180, 189 (D.C.Cir. 1986) (Scalia, J., sitting by designation)).

Because the material facts of the interaction between Standt and the defendants at the checkpoint in the early morning hours of January 27, 1999 are in such "serious dispute," *see supra,* it is premature to decide whether probable cause existed to arrest Standt or whether the actions of the officers were objectively reasonable. *Lennon,* 66 F.3d at 421 ("Disputes over reasonableness are usually fact questions for juries.") (*quoting Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990)). Although courts should rule on qualified immunity defenses "early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive," *Saucier,* 121 S.Ct. at 2155, the question of qualified immunity in this case revolves around disputed issues of material fact, and therefore may not be resolved at this juncture.

Summary judgment on the false arrest and imprisonment claim is denied.

### IV. *Summary Judgment is Granted on the Malicious Prosecution Claim*

Finally, defendants seek summary judgment on the malicious prosecution claim on the grounds that (1) probable cause exist-

ed; (2) the defendants did not take an active part in the prosecution of Standt; (3) contend that traffic infractions may not be the subject of malicious prosecution actions because they are civil, rather than criminal, in nature; and (4) there is no evidence that the defendants acted with malice. (Def. Br. at 15–16.)

■ The elements of malicious prosecution under New York law are: (1) the initiation and continuation of a criminal proceeding by the defendant against the plaintiff; (2) lack of probable cause for commencing the criminal proceeding; (3) actual malice; and (4) the termination of the proceeding in favor of the accused. *Cook v. Sheldon,* 41 F.3d 73, 79 (2d Cir. 1994); *Smith–Hunter v. Harvey,* 95 N.Y.2d 191, 195, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000).

■ The second, third and fourth factors have been satisfied here. As discussed above, there is a triable issue of fact as to whether probable cause existed for the arrest of Standt. For the same reason, it is premature to determine whether actual malice motivated the initiation of the proceedings. *See Chimurenga v. City of New York,* 45 F.Supp.2d 337, 344 (S.D.N.Y.1999) (finding that triable issue of fact necessarily existed as to malice where jury could find that probable cause was lacking). Both summonses were dismissed in traffic court after an adversarial proceeding.

In order to satisfy the first element of malicious prosecution, a plaintiff must show that the defendant in question either initiated criminal charges or played an active role in facilitating the filing by others. *See Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir.1997). In support of his argument that his traffic court proceedings were criminal in nature, the plaintiff has noted the Vehicle and Traffic Law's provision that driving without a li-

cense "shall be punishable by a fine of not less than fifty nor more than two hundred dollars, or by imprisonment for not more than fifteen days, or by both such fine and imprisonment." N.Y. V.T.L. § 509(1) (McKinney's 2001). On the other hand, the defendants contend that in New York, both driving without a license and driving without a seatbelt are traffic infractions, not criminal violations. *See People v. Griffin,* 116 Misc.2d 751, 456 N.Y.S.2d 334, 339 (1982) ("Driving without a license is a traffic infraction."); N.Y. V.T.L. § 1229–(c)(5) (McKinney's 2001) (driving without a seatbelt punishable by maximum fine of $50).

Despite the availability of imprisonment as a punishment for violation of the law against driving without a license, the Vehicle and Traffic Law specifically states that a "traffic infraction is not a crime and the punishment imposed therefor shall not be deemed for any purpose a penal or criminal punishment." N.Y. V.T.L. § 155 (McKinney's 2001); *see also* N.Y. V.T.L. § 1800(a) (McKinney's 2001) ("It is a traffic infraction for any person to violate any of the provisions of this chapter or of any local law, ordinance, order, rule or regulation adopted pursuant to this chapter, unless such violation is by this chapter or other law of this state declared to be a misdemeanor or a felony."); N.Y. Penal L. § 55.10(4) (McKinney's 2001) ("Notwithstanding any other provision of this section, an offense which is defined as a 'traffic infraction' shall not be deemed a violation or a misdemeanor by virtue of the sentence prescribed therefor.").

As violation of § 509 is not a criminal offense, the traffic court proceeding is civil in nature, a regulatory rather than a "criminal proceeding." Therefore, the first element of the malicious prosecution claim cannot be met, and summary judgment is granted on that claim.

## Conclusion

For the foregoing reasons, the defendants' motion for partial summary judgment is granted in part and denied in part.

It is so ordered.