2001-NMSC-029

33 P.3d 267

**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Ricardo MARTINEZ–RODRIGUEZ,**
**Defendant–Appellant.**

No. 25,634.

Supreme Court of New Mexico.

Sept. 14, 2001.

Phyllis H. Subin, Chief Public Defender, Sheila Lewis, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Appellee.

Professor Thomas H. Rice, Spokane, WA, for Amicus Curiae National Association of Criminal Defense Lawyers.

Professor Barbara E. Bergman Albuquerque, NM, for Amicus Curiae New Mexico Association of Criminal Defense Lawyers.

*OPINION*

FRANCHINI, Justice.

{1} Following a jury trial, Defendant Ricardo Martinez Rodriguez was convicted in the deaths of three men of the following crimes: three counts of first degree murder contrary to NMSA 1978, § 30-2-1(A)(1) (1994); three counts of kidnapping with great bodily harm contrary to NMSA 1978, § 30-4-1 (1995); conspiracy to commit murder contrary to NMSA 1978, § 30-28-2 (1979) and Section 30-2-1(A)(1); conspiracy to commit kidnapping contrary to Section 30-28-2 and Section 30-4-1; three counts of tampering with evidence contrary to NMSA 1978, § 30-22-5 (1963); unlawful taking of a vehicle contrary to NMSA 1978, § 66-3-504 (1998); and receiving a stolen vehicle contrary to NMSA 1978, § 66-3-505 (1978). This Court has jurisdiction under Rule 12-102(A)(1) NMRA 2001 (providing for direct appeal to the Supreme Court in cases in which a sentence of life imprisonment has been imposed).

{2} On appeal, Defendant[1] asserts that he was denied a fair trial because (1) his rights under the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261, [hereinafter VCCR] were violated; (2) the trial court erred in admitting a co-defendant's statement; (3) evidence of other bad acts by the Defendant was improperly admitted; (4) the kidnapping jury instruction was incorrect; (5) the State overcharged the crimes against him; and (6) cumulative error occurred. Under the facts of this case, we reverse Defendant's conviction for receiving a stolen vehicle. Finding no merit in the remaining claims, we affirm all other convictions.

I. FACTUAL AND PROCEDURAL BACKGROUND

{3} On February 25, 1997, the police were summoned to a motel room in Albuquerque, New Mexico, when a motel employee discovered the bodies of two men in one of the rooms she had been assigned to clean. Both men were strangled to death; they had been gagged, bound, and beaten. Missing from the scene was the man who had rented the room the night before and the 1987 Ford Taurus that belonged to one of the victims. The body of the third man would not be found until March 12, 1997, when a state highway employee spotted the body at the bottom of a hillside along Interstate 25 north of Santa Fe, New Mexico. The third victim had also been killed by strangulation; he was gagged and bound hand and foot in a manner similar to the victims in the motel room. The body had been wrapped in a bedspread from the motel. The key to the motel room was found in his pocket, and the one boot he was wearing was the mate to a boot recovered from the motel room. According to the testimony at trial, the three victims, who were friends, had planned to meet four Mexican men at the motel that night for a sexual encounter.

{4} On March 3, 1997, four Mexican nationals were arrested in Salina, Kansas, driving the stolen Taurus. The four men were Defendant, Valentin Reyes, Ricardo Martinez–Silva, and Rene Hernandez–Hernandez. The Kansas authorities contacted the police in Albuquerque, and a team of officers went to Kansas to interview the four men. The team included Detective Gandara, the case agent in charge of the murder investigation, and Detective Torres, a Spanish-speaking officer. The following day, the Albuquerque officers interviewed Defendant and the three others about the murders. Defendant was given his *Miranda* rights in Spanish, orally and in writing, signed a waiver of rights form, and was interviewed by the detectives. He denied knowing anything about

---

1. For ease of reference, the opinion attributes to one party, Defendant, all arguments made on his behalf whether the arguments were made by Defendant or Amicus Curiae.

the murders, knowing any of the victims, and having been in Albuquerque. He also stated that the four men purchased the car in Denver and that he had never been in Salt Lake City.

{5} While Defendant was in custody in Kansas, he talked to another prisoner, Efrain Porras, who was in jail on a federal drug charge. On March 3, 1997, Defendant told Porras that he and his three confederates were in jail for having killed two people. But, he disclosed to Porras, there were actually three victims; the third had been buried in the snow and had not yet been found. Defendant also told him that the three victims had been strangled to death. Porras told his attorney about the conversation who reported it to a district attorney. At trial, Porras described Defendant's manner in relating this crime as being proud and even euphoric.

{6} Defendant was indicted by a grand jury in May 1997 and pleaded not guilty to all charges. He was tried separately from his confederates. Testimony at trial by the investigating officers revealed that Defendant's fingerprints were in the motel room on an identification card of one of the victims. His fingerprints and his saliva, identified from DNA testing, were found on a beer can in the motel room. His DNA was also matched to anal swabs taken from the body of the third victim. A friend of Valentin Reyes, Carmen Grover, identified Defendant as having been with the other men when they visited her in Salt Lake City. She also identified the stolen Taurus as the car the four men were driving. After an eleven day jury trial, Defendant was convicted of all charges and sentenced to three consecutive life sentences plus sixty-nine years.

## II. DISCUSSION

### A. Vienna Convention on Consular Relations.

{7} Defendant claims that he was not advised that he could confer with Mexican consular officials after his arrest as provided for by the VCCR. He contends that the appropriate remedy for this failure is suppression of the statement he gave to the police in Kansas. The VCCR is a multilateral treaty signed by more than 100 nations, including the United States and Mexico. It was drafted in 1963 and ratified by the United States in 1969. *United States v. Lombera–Camorlinga,* 206 F.3d 882, 884 (9th Cir.) (en banc), *cert. denied,* 531 U.S. 991, 121 S.Ct. 481, 148 L.Ed.2d 455 (2000). The treaty contains seventy-nine articles concerning the rights and functions of consular officers and also the privileges and immunities associated with their positions. *Id.* Defendant's argument relies upon Article 36(1)(b) of the treaty which provides that arrested foreign nationals shall be informed that they may confer with their consulates as follows:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:[2]

. . . .

(b) if he [or she] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his [or her] rights under this sub-paragraph.

VCCR, Apr. 24, 1963, art. 36(1)(b); 21 U.S.T. at 100–01.

{8} Defendant filed a pretrial motion to suppress the statement based upon an alleged violation of the VCCR. In denying the motion, the trial court noted first that Article 36(1)(b) of the VCCR was ambiguous. The court further found that (1) Defendant had not established that the treaty had been violated; (2) even if there had been a violation, no remedy was provided in the VCCR; and (3) no violation of due process had oc-

2. The sending state is the nation of the arrested national. The receiving state is the arresting nation.

curred because Defendant had been given his *Miranda* rights and accorded his right to counsel. An appellate court reviews rulings on a motion to suppress to determine whether the law was correctly applied to the facts, reviewing them in the light most favorable to the prevailing party and drawing all reasonable inferences to support the decision below. *State v. Salgado,* 1999–NMSC–008, ¶ 16, 126 N.M. 691, 974 P.2d 661. An appellate court conducts a de novo review of a district court's interpretation of a treaty. *Kreimerman v. Casa Veerkamp, S.A. de C.V.,* 22 F.3d 634, 639 (5th Cir.1994).

{9} The State disputes Defendant's interpretation of the treaty and asks this Court to uphold the trial court's denial of relief to Defendant. The State's position is that Defendant lacks standing under the VCCR because the intent of the treaty signatories, as the Preamble states, was "to ensure the efficient performance of functions by consular posts on behalf of their respective states." Therefore, the State argues, the VCCR was not intended to create a private right of action for foreign nationals to enforce through the domestic courts of the signatories. Additionally, the State argues that even if Defendant had standing to challenge a violation of the VCCR, suppression of his statement would not be the proper remedy under the treaty, and Defendant has shown no prejudice from the lack of notification.

{10} The parties agree that Defendant was not told after his arrest that he could confer with Mexican consular officials. The record does not reflect whether the Salina or Albuquerque police knew about the treaty requirements. It appears that consular officials in Mexico were not notified of the four defendants' arrests until May 28, 1997, when the families of the defendants contacted them. But a determination that the notification provision of Article 36(1)(b) was violated does not resolve the matter. Rather the threshold question is whether an individual foreign national has standing to assert a claim under the VCCR in a domestic criminal case.

 {11} Upon ratification, a treaty becomes the law of the land on an equal plane with federal statutes. U.S. Const. art. VI, cl. 2. As a general rule, however, international treaties do not create personal rights that an individual may enforce in judicial courts. *United States v. Li,* 206 F.3d 56, 60 (1st Cir.2000) (en banc); *Matta–Ballesteros v. Henman,* 896 F.2d 255, 259 (7th Cir.1990) ("Even where a treaty provides certain benefits for nationals of a particular state—such as fishing rights—it is traditionally held that any rights arising from such provisions are, under international law, those of states and . . . individual rights are only derivative through the states.") (quoted authority and quotation marks omitted). "Treaties are contracts between or among independent nations." *United States v. Zabaneh,* 837 F.2d 1249, 1261 (5th Cir.1988). Treaties are "designed to protect the sovereign interests of nations, and it is up to the offended nations to determine whether a violation of sovereign interests occurred and requires redress." *Id.*

 {12} Generally, for courts to find that a treaty provides a private right of action, the document should explicitly provide such a right. *Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 968 (4th Cir.1992) ("International treaties are not presumed to create rights that are privately enforceable."); *accord Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 442, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (interpreting the Geneva Convention of the High Seas, the Supreme Court determined that the convention only set forth substantive rules of conduct and could not create a private right of action in the absence of any language to that effect). "In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *United States v. Alvarez–Machain,* 504 U.S. 655, 663, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). The text of the treaty must be "interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose." *Kreimerman,* 22 F.3d at 638 (quoting the Vienna Convention on the Law of Treaties, May 22,

1969, art. 31.1, 1155 U.N.T.S. 331.[3]) In *Kreimerman*, the Fifth Circuit Court of Appeals reasoned that courts should interpret treaty provisions narrowly for fear of waiving sovereign rights that the government or people of the State never intended to cede. *Id.* at 638–39; *see also Air France v. Saks*, 470 U.S. 392, 399, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985) ("[I]t is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties.").

■ {13} Applying these general principles, the VCCR appears to be a customary international treaty whose purpose is to facilitate consular activity between sending and receiving states. The preamble to the VCCR describes the purpose of the treaty as "not to benefit individuals but to ensure the efficient performance of functions by consular posts." VCCR, 21 U.S.T. at 79. Similarly, the first sentence of Article 36, which is the introduction to section (b)(1), begins with the language "With a view to facilitating the exercise of consular functions relating to nationals of the sending State." Notifying arrested foreign nationals that they may confer with their nation's consul would "facilitate the exercise of consular functions." But a determination that the treaty confers benefits upon arrested foreign nationals is not tantamount, as Defendant contends, to determining that this language was intended to create a private right of action. The text of the treaty does not state or even suggest that the signatories intended to provide for individual judicial enforcement of the provisions. *See United States v. Ademaj*, 170 F.3d 58, 67 (1st Cir.1999) (holding that "the Vienna Convention itself prescribes no judicial remedy or other recourse for its violation"); *Li*, 206 F.3d at 66 (Selya, J., and Boudin, J., concurring) ("Nothing in [the VCCR] text explicitly provides for judicial enforcement of their consular access provisions at the behest of private litigants."). Rather, the intentions of the signatories regarding the proper forum for addressing violations of the treaty are reflected in the Optional Protocol for the Compulsory Settlement of Disputes which the United States also ratified. Optional Protocol, April 24, 1963, 21 U.S.T. 325, 596 U.N.T.S. 487 [hereinafter Optional Protocol]. In the Optional Protocol, the United States and the other parties agreed that the International Court of Justice (ICJ) would be the primary forum for the settlement of disputes under the VCCR. Optional Protocol, 21 U.S.T. at 326 ("Disputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the International Court of Justice . . . ."). Under the Optional Protocol only states may bring disputes to the ICJ. *Id.*

■ {14} Further we must consider that the treaty is dealing with matters of international relations, not domestic criminal law. We find persuasive the reasoning in *Li*, 206 F.3d at 67 (Selya, J., and Boudin, J., concurring), that "when foreign affairs are involved, the national interest has to be expressed through a single authoritative voice." The negotiation and administration of treaties is a matter reserved to the Executive Branch of the federal government with ratification by the Senate. U.S. Const. art. II, § 2, cl. 2. Without a right of private enforcement clearly having been agreed upon by the signatories "[i]ncalcuable mischief can be wrought by gratuitously introducing into this often delicate process court enforcement at the instigation of private parties." *Li*, 206 F.3d at 68 (Selya, J., and Boudin, J., concurring). We therefore consider the State Department's interpretation of the treaty in our analysis. *See Li*, 206 F.3d at 63; *accord El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999) ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty."). " 'While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight.' " *United States v. Minjares–Alvarez*, 264 F.3d 980 (10th Cir.

---

**3.** The United States is not a party to the Vienna Convention on the Law of Treaties but does view parts of the Convention as declarative of customary international law. *Kreimerman*, 22 F.3d at 638, n. 9.

2001) (quoting *Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961) (footnote containing citation omitted)). With regard to the VCCR, the State Department has consistently taken the position that although implementation of the treaty may benefit foreign nationals, it does not create judicially enforceable individual rights that can be remedied in the criminal justice systems of the member states. *Li,* 206 F.3d at 63–64. According to the State Department, "[t]he [only] remedies for failures of consular notification under the [Vienna Convention] are diplomatic, political, or exist between states under international law."[4] *Id.* (quoted authority and quotation marks omitted).

{15} For these reasons, we do not find Defendant's arguments persuasive and thus determine that the provisions of the VCCR do not create legally enforceable individual rights. The presumption against implying rights in international agreements, *see Li,* 206 F.3d at 60, weighs against Defendant's position. We conclude that this Court should not depart from the general principles of international law and the expressed position of the State Department to find that Defendant has a private right of action to enforce the VCCR in our courts. The VCCR, after all, is an agreement negotiated among sovereign states, including the United States and Mexico, not New Mexico and Mexico. Accordingly, we hold that Defendant does not have standing to enforce the provisions of the VCCR. The trial court did not abuse its discretion when it refused to suppress Defendant's statement made to the police during the Kansas interview.

{16} In general, other courts that have considered the issue of individual standing have avoided deciding whether Article 36 was intended to create judicially enforceable individual rights and resolved their cases without reaching the merits of the standing argument. *See United States v. Jimenez–Nava,* 243 F.3d 192, 196, n. 4 (5th Cir.) (listing cases), *cert denied,* 533 U.S. 962, 121 S.Ct. 2620, 150 L.Ed.2d 773 (2001). They have typically followed the path taken by the Tenth Circuit in deciding that it was unnec-

essary to resolve the question of standing because the court found that, even assuming for the sake of argument that a defendant had standing, the remedy for a violation of the VCCR would not include suppression of evidence or dismissal of an indictment. *See United States v. Chanthadara,* 230 F.3d 1237, 1255 (10th Cir.2000) ("In our view, it is neither appropriate nor necessary to decide this unresolved issue under the facts presented here."). In reaching this decision, the Tenth Circuit relied upon the holding from *Li,* 206 F.3d at 60, that "irrespective of whether or not the treaties create individual rights to consular notification, the appropriate remedies do not include suppression of evidence or dismissal of the indictment." The Ninth Circuit reached a similar conclusion in *Lombera Camorlinga,* 206 F.3d at 888 (holding that violation of Vienna Convention does not require suppression of subsequently obtained evidence). The United States Supreme Court, in a per curiam opinion, left the question of standing unresolved when it held that the defendant's claim under the VCCR had been procedurally defaulted because the defendant failed to raise the issue in state court. *Breard v. Greene,* 523 U.S. 371, 376, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998). The Court did observe, however, that with regard to the claims of Paraguay, "neither the text nor the history of the Vienna Convention clearly provides a foreign nation a private right of action in United States courts to set aside a criminal conviction and sentence for violation of consular notification provisions." *Id.* at 375, 118 S.Ct. 1352. With the Supreme Court having expressed doubt that a signatory nation has a private right of action in domestic courts under the VCCR, it seems unlikely to us that the Court would find that an individual criminal defendant could pursue an action.

{17} Our holding that Defendant does not have standing disposes of his VCCR claim; we address briefly his remaining two arguments under the treaty. Defendant additionally argues that the failure of government authorities to notify an arrested foreign national that he or she may confer with a

---

**4.** The record does not indicate and Defendant does not maintain that the government of Mexico has protested to the United States about any violation of the VCCR in this case.

consul should be regarded as the equivalent of a failure to inform an individual of his or her *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He urges the adoption of a bright line rule to deter further violations of the VCCR and to protect the right of consular notification through use of the exclusionary rule. To find that suppression is the necessary consequence of a violation of Article 36, a court must find that remedy in the text of the VCCR. *See Goldstar,* 967 F.2d at 968. Nothing in the text of the VCCR, however, requires a *Miranda* remedy or even indicates that it was considered. As the Ninth Circuit concluded, there is no indication that the drafters of the Vienna Convention had these "uniquely American rights in mind, especially given the fact that even the United States Supreme Court did not require Fifth and Sixth Amendment post-arrest warnings until it decided *Miranda* in 1966, three years after the treaty was drafted." *Lombera–Camorlinga,* 206 F.3d at 886.

{18} Although, as noted, other courts have not reached the issue of whether Article 36 was intended to create an individually enforceable right, they have reached a consensus in deciding VCCR claims that is contrary to Defendant's position. They have routinely held that suppression of evidence is not the proper remedy for a violation of the VCCR because the treaty does not provide suppression as a remedy and does not create any fundamental, constitutional rights. *Ademaj,* 170 F.3d at 67; *United States v. Chaparro–Alcantara,* 37 F.Supp.2d 1122, 1125 (C.D.Ill. 1999) ("Application of the exclusionary rule is only appropriate when the Constitution or a statute requires it."); *cf. Dickerson v. United States,* 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (holding that the exclusionary rule is designed to remedy violations of constitutional rights). Because the exclusionary rule is designed to protect core constitutional values, it should only be employed when those values are implicated; a treaty signed by the United States does not alter the Constitution so that a violation of Article 36 does not rise to the level of a

constitutional violation.[5] *See Murphy v. Netherland,* 116 F.3d 97, 99–100 (4th Cir. 1997) ("[E]ven if the Vienna Convention on Consular Relations could be said to create individual rights (as opposed to setting out the rights and obligations of signatory nations), it certainly does not create constitutional rights."); *United States v. Esparza–Ponce,* 7 F.Supp.2d 1084, 1097 (S.D.Cal.1998) (holding that "a violation of the Convention does not rise to the level of a *Miranda* violation" and that "[a]pplying the presumption of prejudice mandated by *Miranda* is therefore inappropriate."); *Waldron v. Immigration and Naturalization Serv.,* 17 F.3d 511, 518 (2d Cir.1993) ("Although compliance with our treaty obligations clearly is required, we decline to equate such a provision with fundamental rights, such as the right to counsel, which traces its origins to concepts of due process.").

█ {19} Furthermore, we are in accord with other courts which have required a showing of prejudice. Defendant has not shown that he was prejudiced by the officers' failure to abide by the treaty; he has not demonstrated how the violation of the VCCR affected the outcome of his case. *See Breard,* 523 U.S. at 377, 118 S.Ct. 1352 ("[I]t is extremely doubtful that the violation [of the VCCR] should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial."). He was advised of his *Miranda* rights and signed a waiver of rights form. Defendant does not argue on appeal that his waiver of rights was not knowing or voluntary. Although he spoke with the officers, he made no inculpatory statements but rather denied any knowledge of the murders and said that he had not even been in Albuquerque. Defendant was represented through the pretrial stages and at trial by experienced counsel who were capable of explaining our criminal procedures and his corresponding rights. Defendant does not allege that the Mexican consul would have been more familiar with the American legal system than his attorney. He does speculate

---

5. To the extent that the special concurrence equates a treaty right with a constitutional right,

we must respectfully disagree.

that he might not have waived his rights had he been advised that neither he nor his family would suffer reprisals for exercising those rights. This assertion seems dubious. Detective Gandara testified that Defendant willingly agreed to speak and was relaxed and cooperative during the interview. Moreover, the officers would not have been required, under the VCCR, to stop their interrogation after informing Defendant about consular notification and access. *See United States v. Rodrigues*, 68 F.Supp.2d 178, 184 (E.D.N.Y. 1999) ("There is no prohibition anywhere in the Convention against continuing to question a foreign national while awaiting consular contact."); *Lombera–Camorlinga*, 206 F.3d at 886 (same).

{20} The Consul of Mexico based in Albuquerque submitted an affidavit at the suppression hearing in which he described the actions that he would have taken upon notification:

> Had the police officers without delay told the defendants of their rights to consular assistance, in a timely fashion as the treaty requires, in particular at the time of their arrest, or before the officers questioned them, a Mexican consulate representative would have gone to visit them and advised them not to speak with anyone, and that they in fact would not suffer any adverse consequence if they chose not to give statements, also that statements that they gave could have been used against them in court, that they can also have a court certified interpreter to be present at any stage of the proceedings, and also about the right to request assistance of legal counsel.

Neither the assertions of Defendant nor the Consul's affidavit reach a showing of prejudice. The advice described by the Consul duplicates the rights guaranteed to Defendant by *Miranda*. Defendant was advised of the constitutional rights to remain silent and to have an attorney. Under these circumstances, courts have generally held that a defendant has not been prejudiced by not being told about consular notification. *See Rodrigues*, 68 F.Supp.2d at 184 ("Prejudice has never been—nor could reasonably be—found in a case where a foreign national was

given, understood, and waived his or her *Miranda* rights."); *United States v. Alvarado–Torres*, 45 F.Supp.2d 986, 990 (S.D.Cal. 1999) (holding that the consul's advice would have been cumulative to the *Miranda* warnings); *Chaparro–Alcantara*, 37 F.Supp.2d at 1126 (same); *cf. Breard*, 523 U.S. at 379, 118 S.Ct. 1352 (Souter, J., concurring) (agreeing that "the lack of any reasonably arguable causal connection between the alleged treaty violations and [defendant's] convictions and sentences disentitle him to relief").

### B. Statement of Co-defendant.

■ {21} Defendant asserts that the trial court erred when it admitted the out-of-court statement of another defendant as a statement against penal interest. *See* Rule 11–804(B)(3) NMRA 2001. He argues that the statement did not qualify as a statement against interest and that its admission violated his confrontation rights under the Sixth Amendment. U.S. Const. amend. VI. "As a general matter, we review a trial court's admission of evidence under an exception to the hearsay rule only for an abuse of discretion." *State v. Torres*, 1998–NMSC–052, ¶ 15, 126 N.M. 477, 971 P.2d 1267; *accord State v. Benavidez*, 1999 NMSC 041, ¶ 2, 128 N.M. 261, 992 P.2d 274; *State v. Gonzales*, 1999–NMSC–033, ¶ 5, 128 N.M. 44, 989 P.2d 419, *cert. denied*, 529 U.S. 1025, 120 S.Ct. 1434, 146 L.Ed.2d 323 (2000).

■ {22} Rule 11–804 defines exceptions to the hearsay rule that apply when the declarant is unavailable as a witness; one of the exceptions is a statement against interest which is defined as follows:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

Rule 11–804(B)(3). This type of statement is admissible as an exception to the hearsay rule "because it is presumed that one will not make a statement damaging to one's self unless it is true." 5 Jack B. Weinstein &

Margaret A. Berger, *Weinstein's Federal Evidence* § 804.06[1], at 804–47 (Joseph M. McLaughlin, ed., 2d ed.2000). This guarantee of reliability provides the justification for the exception. A reviewing court must decide whether the trial court abused its discretion in making the determination that a statement so far tended to subject a person to criminal liability, rather than to relieve him or her of it, that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true. *Torres,* 1998 NMSC 052, ¶ 16, 126 N.M. 477, 971 P.2d 1267.

{23} While the four defendants were in custody in Kansas, jail officials found a message, hand written in Spanish, concealed in a pair of shoes belonging to Martinez–Silva. The note was signed by Reyes. Defendant subsequently filed a pretrial motion to suppress the note. After a suppression hearing, the trial court ruled that the note could be admitted at Defendant's trial. The trial court examined the various statements made by Reyes in the note and determined they were against his penal interest and subjected him to criminal liability. The note instructed the others as follows:

> Whenever you want to write to Mexico, write to Carmen [Grover] and send a letter to your mother and so that Carmen will send it to Mexico. You deny everything and I too denied everything. They want to lie to us that they have photos of us in Albuquerque. Just say we were never there. Just about 3 hours in Salt Lake City, Utah and we worked in Denver cleaning homes and gardens. Let's just see what happens. Throw out this paper after you read it.
>
> What they found was the blood from their shirts. I think we will remain inside a few years, well we all said different things but the 4 of us are equally guilty, nobody less nobody more. I'll see you.

In this case, Defendant does not challenge the unavailability of declarant Reyes, *see* Rule 11–804(A), but rather the trial court's determination that the statement by Reyes was against his penal interest. As we understand Defendant's argument, he is maintaining that the note is not against Reyes' penal

interest because he is not accepting responsibility, but rather "telling the recipient what to say to the police-regardless of the truth" and trying to shift responsibility.

{24} In evaluating whether a declarant's statement qualifies under Rule 11–804(B)(3), a statement-by-statement inquiry must be conducted to determine if the statement was against the declarant's interest. *See Torres,* 1998–NMSC–052, ¶ 11, 126 N.M. 477, 971 P.2d 1267 (agreeing with *Williamson v. United States,* 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), that a statement-by-statement analysis, viewing it in context, is proper method for determining reliability of the declaration against interest). In their police interviews, each of the four men had denied involvement in the murders, but their statements as to their activities after entering this country differed and were contradictory. The first paragraph of the note, discussing the need for the four of them to develop a consistent cover story, reveals knowledge of the crimes and a consciousness of guilt. *See Torres,* 1998–NMSC–052, ¶ 14, 126 N.M. 477, 971 P.2d 1267 (concluding that "facially-neutral but contextually-incriminating details may be admitted if a reasonable person in the declarant's position would not have revealed them unless believing them to be true due to their strong tendency to subject the declarant to criminal liability"). The instruction to destroy the note after reading it also shows a consciousness of guilt and further demonstrates that Reyes knew the statement was against his interest. *See State v. Martinez,* 1999–NMSC–018, ¶ 34, 127 N.M. 207, 979 P.2d 718 (observing that changing statement to the police evidenced consciousness of guilt); *State v. Lujan,* 103 N.M. 667, 674, 712 P.2d 13, 20 (Ct.App.1985) (concluding that an attempt to deceive police shows a consciousness of guilt). In the second paragraph, Reyes refers to possible police testing of the defendants' shirts for the blood of the victims and acknowledges that they may be facing incarceration ("we will remain inside a few years"). As the Supreme Court observed in *Williamson,* 512 U.S. at 603, 114 S.Ct. 2431, a self-inculpatory statement by a declarant showing that he knew something "can in some situations help the jury infer that his confederates knew it

as well." We are in agreement with the trial court that the inculpatory nature of "the 4 of us are equally guilty" is evident. Contrary to Defendant's assertion, the statement directly equally incriminates Reyes and the other three men in the murders, rather than minimizing his culpability by shifting responsibility to them.

{25} In addition to conducting a statement-by-statement review, a trial court should also "examine the statement in light of all surrounding circumstances." *Torres*, 1998–NMSC–052, ¶ 29, 45 F.Supp.2d 986. In considering the surrounding circumstances in this case, we observe first that the statement was made privately to a co-defendant; Reyes was not communicating with police in an attempt to curry favor or in response to a promise of leniency. He never intended for the statement to become public. After being questioned by the police, Reyes knew that he was a suspect in the murders when he made the statement. It was clearly against his penal interest, and he did not attempt to shift responsibility away from himself to the other three defendants. Because we do not think that a reasonable person would falsely admit his involvement in such serious crimes, we hold that the statement fell within the penal interest exception to the hearsay rule and the trial court did not abuse its discretion in admitting the statement.

{26} Defendant also contends that the statement should not have been admitted because it violated his right of confrontation under the Sixth Amendment. We review de novo the question of whether the Confrontation Clause has been violated by the admission of hearsay evidence. *Gonzales*, 1999–NMSC–033, ¶ 16, 128 N.M. 44, 989 P.2d 419. In general, there is no Confrontation Clause problem in admitting a hearsay statement if the declarant is unavailable and the statement bears adequate indicia of trustworthiness. *Id.* ¶ 17, 989 P.2d 419. The requisite indicia of trustworthiness may be found either by determining that the hearsay exception is a firmly rooted one or that the circumstance surrounding the making of the statement "bears adequate indicia of reliability." *See Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)

(quoted authority and quotation marks omitted). This Court previously has held that the penal interest exception to the hearsay rule is "a firmly rooted hearsay exception for purposes of satisfying the indicia of reliability requirement of the Confrontation Clause." *Torres*, 1998–NMSC–052, ¶ 32, 126 N.M. 477, 971 P.2d 1267; *accord Gonzales*, 1999–NMSC–033, ¶ 19, 128 N.M. 44, 989 P.2d 419. Typically, a hearsay statement that satisfies the penal interest exception will also satisfy the requirements of the Confrontation Clause because the issue of trustworthiness has already been resolved in favor of admissibility. *Gonzales*, 1999–NMSC–033, ¶ 39, 128 N.M. 44, 989 P.2d 419.

{27} Nevertheless, Defendant argues that this Court should disregard its previous case law to follow the United States Supreme Court in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). We declined to follow a similar argument in the motion for rehearing in *Gonzales* because, under our case law, the challenged statement in *Lilly* would not have survived a Rule 11–804(B)(3) analysis because the statement in that case did not implicate the declarant in the murder and instead placed blame for the murder on a co-defendant. *Gonzales*, 1999–NMSC–033, ¶¶ 36–37, 128 N.M. 44, 989 P.2d 419. The Court in *Gonzales* then ratified the holding in *Torres* that we regard this hearsay exception to be firmly rooted. 1999–NMSC–033, ¶¶ 30, 39–40, 128 N.M. 44, 989 P.2d 419. We are unpersuaded by Defendant's argument and reaffirm that, in New Mexico, a statement against penal interest within the meaning of Rule 11–804(B)(3) is a firmly rooted exception to the hearsay rule. The trial court did not err in admitting Reyes' statement into evidence as a statement against penal interest and permitting the detective to testify about the statement.

### C. Testimony by Detective.

{28} Defendant asserts that the trial court improperly permitted the State to introduce evidence that violated Rule 11–404(B) NMRA 2001. He also contends that the trial court failed to weigh the probative value of the challenged evidence against its

prejudicial effect as required by Rule 11–403 NMRA 2001 (stating that trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice"). The admission of evidence is entrusted to the discretion of the trial court and will not be disturbed absent a showing of abuse of that discretion and that an error in the admission of evidence was prejudicial. *See State v. Jett,* 111 N.M. 309, 312, 805 P.2d 78, 81 (1991).

{29} During direct examination, Detective Torres testified at length about the murder investigation that had been conducted in Albuquerque and in Kansas. He described the manner in which he conducted the interviews in Kansas and the questions he had asked Defendant. He also described Defendant's responses and demeanor which he characterized as laughing and cocky. During cross-examination, defense counsel challenged the detective's description and advanced the argument that the detective really did not know the reasons for Defendant's conduct during the interview. Defense counsel then asked if Defendant's demeanor could instead be attributed to being afraid or nervous. Detective Torres responded that, based on his experience with interviews, he thought Defendant's demeanor was attributable to arrogance.

■ {30} First, we must determine if Detective Torres' testimony about Defendant's demeanor was relevant. Rule 11–403. The State responds, and we agree, that the testimony about Defendant's demeanor was offered to counter the defense theory that Defendant's actions after arrest were caused by fear. Defense counsel had begun her opening statement to the jury by stating that "This is a case about fear, about Ricardo's fear. This is a case about protection and about Ricardo's need to protect himself." Defendant did not testify, but defense counsel argued during the trial that this fear could be attributed to a number of reasons including fear of his companions, deception and intimidation by the police, or fear of mistreatment in prison. Throughout the cross examination of Detective Torres and Detective Gandara, the implication was raised that they had been trained in deceptive and abusive interview techniques designed to obtain confessions and that Defendant's behavior had been induced by those techniques. In closing argument Defendant declared that his conduct during the interview with the detectives in Kansas and his admissions to Porras had been attempts to protect himself by portraying himself as a dangerous person because he was afraid.

{31} Although the opening and closing statements and questions by defense counsel were not evidence, they did suggest to the jury that Defendant's statements to the police were the product of his fears and therefore not to be trusted. Defendant sufficiently put at issue the circumstances surrounding these statements to open the door for the state to respond to those assertions. *State v. Smith,* 2001–NMSC–004, ¶¶ 38–40, 130 N.M. 117, 19 P.3d 254 (determining that "it is clear that the prosecutor was responding to defense counsel's claim during opening argument and was thus commenting on what Defendant had already invited"); *State v. Reynolds,* 111 N.M. 263, 267, 804 P.2d 1082, 1086 (Ct.App.1990) ("A party cannot complain of prejudice possibly resulting from a situation which he created by his own remarks during the course of the trial.") (quoted authority and quotation marks omitted).

■ {32} We disagree with Defendant's assertion that the trial court abused its discretion by not applying the balancing test described in Rule 11–403. Our review of the record reveals that during a bench conference on this testimony, the court determined that the questions related to Defendant's persona and, therefore, the evidence developed would not be too prejudicial. The trial court then cautioned the prosecutor about this line of questioning, telling him to confine his questions to Defendant's demeanor at the interview. The trial court conducted the proper Rule 11–403 balancing analysis to determine whether the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. *See State v. Aragon,* 1999–NMCA–060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 (stating that there is a presumption in favor of the correctness of a trial court's rulings). The trial court reasonably limited the nature of the questioning

and correctly determined that it was relevant because it responded directly to a theory of the defense.

■ {33} Next, as we understand Defendant's argument, he is asserting that this testimony was improper propensity evidence. Defendant contends that the introduction of this evidence violated Rule 11–404(B) that "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Defendant cites no authority for the proposition that a description of demeanor is evidence of other bad acts. After a review of the record, we conclude that the witness's description of Defendant's demeanor and his mood during the interview was properly admitted and did not rise to the level of a crime, wrong, or act that Rule 11–404(B) was intended to address. We conclude that the trial court acted within its discretion in admitting the evidence.

■ {34} Moreover, Defendant has not shown how he was prejudiced by the statement of this detective. *See In re Ernesto M.,* 1996–NMCA–039, ¶ 10, 121 N.M. 562, 915 P.2d 318 ("An assertion of prejudice is not a showing of prejudice."). An earlier witness, Detective Gandara, had also described without objection Defendant's cocky attitude and laughing demeanor during the Kansas interview. Additionally, the jury heard an audiotape of the interview accompanied by a transcript in English. These measures allowed the jury to assess Defendant's conduct and then arrive at its own conclusions. The detective's testimony was essentially cumulative to evidence that was already before the jury. *Cf. State v. Woodward,* 121 N.M. 1, 10, 908 P.2d 231, 240 (1995) ("The erroneous admission of cumulative evidence is harmless error because it does not prejudice the defendant.").

### D. Jury Instruction on Kidnapping.

■ {35} Defendant asserts that his three convictions for kidnapping were in error because the wrong jury instruction was given. He appears to argue that the instruction given at trial, which was modeled on UJI 14–404 (withdrawn effective Aug. 1, 1997), was incorrect because it had been superseded by UJI 14–403 NMRA 2001. This assertion is unfounded.

{36} In New Mexico, the crime of kidnapping is defined as follows:

A. Kidnapping is the unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent:

(1) that the victim be held for ransom;

(2) that the victim be held as a hostage or shield and confined against his will;

(3) that the victim be held to service against the victim's will; or

(4) to inflict death, physical injury or a sexual offense on the victim.

NMSA 1978, § 30–4–1(A) (1995).

{37} The kidnapping statute was amended in 1995 to add the language in subsection (4). A new uniform jury instruction for kidnapping incorporating the additional language of the statute was approved by this Court in Order NO. 97–8300 on June 17, 1997. The Order stated that "the above-referenced amendments to Uniform Jury Instructions for criminal cases shall be effective for cases filed in the district courts on and after August 1, 1997." Defendant's case was filed in the second judicial district court on May 7, 1997, when the prosecutor filed an indictment returned by the grand jury on May 6, 1997. *See* Rule 5–201 NMRA 2001 ("A prosecution may be commenced by the filing of: (1) a complaint; (2) an information; or (3) an indictment."). Consequently, UJI 14–404 was still the effective instruction for Defendant's trial, not the amended instruction. *Cf. R.A. Peck, Inc. v. Liberty Fed. Sav. Bank.,* 108 N.M. 84, 93, 766 P.2d 928, 937 (Ct.App.1988) (holding that the district court erred when it based its decision on a rule that was not in effect when the case began).

{38} Moreover, the instruction given at trial properly instructed the jury on the offense of kidnapping. The jury was given UJI 14–404 on kidnapping for each of the three victims:

For you to find the defendant guilty of Kidnapping resulting in great bodily harm as charged in Count 5, the state must prove to your satisfaction beyond a reason-

able doubt each of the following elements of the crime:

1. The defendant took, restrained and/or confined [the victim] by force;

2. The defendant intended to hold [the victim] for service against his will;

3. The defendant inflicted great bodily harm on [the victim];

4. This happened in New Mexico on or about the 25th day of February, 1997.

The instruction correctly reflected the language of the statute and contained all the essential elements of the offense. *See State v. Cawley,* 110 N.M. 705, 710, 799 P.2d 574, 579 (1990) ("Generally, an instruction that parallels the language of the statute and contains all essential elements of the crime is sufficient."); *State v. Gunzelman,* 85 N.M. 295, 301, 512 P.2d 55, 61 (1973) (holding that "instructions are sufficient which substantially follow the language of the statute or use equivalent language"), *overruled on other grounds by State v. Orosco,* 113 N.M. 780, 783, 833 P.2d 1146, 1149 (1992). Accordingly, we conclude that the trial court did not err in the instructions to the jury on the kidnapping charges. The trial court properly instructed the jury on every essential element for the third alternative under the kidnapping statute, holding the victim to service.

### E. Overcharging of Offenses.

{39} Defendant contends that his convictions for two counts of conspiracy and three counts of tampering with evidence resulted from overcharging by the prosecutor and thus violate the double jeopardy clauses of the United States and New Mexico constitutions. After reviewing the record and the applicable law, we conclude that Defendant's claims are without merit. With respect to the conspiracy charges, we conclude that there was sufficient evidence of separate conspiracies to support Defendant's convictions for conspiracy to commit murder and conspiracy to commit kidnapping. Similarly, with regard to the three convictions for tampering with evidence, those convictions are supported by evidence of three separate acts presented at trial.

{40} We reach a different conclusion, however, with regard to the convictions for unlawful taking of a vehicle, contrary to NMSA 1978, § 66-3-504 (1998), and receiving a stolen vehicle, contrary to NMSA 1978, § 66-3-505 (1978). Defendant correctly argues, and the State agrees, that under the facts of this case Defendant cannot be convicted of both crimes. *See State v. Stephens,* 110 N.M. 525, 526, 797 P.2d 314, 315 (Ct.App. 1990) (deciding that, under the facts of the case, "one who steals property cannot be convicted of receiving or retaining the same property"). For this reason, we reverse Defendant's conviction for receiving a stolen vehicle. This decision does not affect the length of Defendant's sentence because the trial court ordered the eighteen month sentence for each of these convictions to be served concurrently with each other and consecutively to the other sentences.

### F. Cumulative Error.

{41} Defendant's final claim relies upon cumulative error to assert that he was deprived of a fair trial. This principle requires reversal if the cumulative effect of errors occurring during trial was "so prejudicial that the defendant was deprived of a fair trial." *State v. Baca,* 120 N.M. 383, 392, 902 P.2d 65, 74 (1995) (quoted authority and quotation marks omitted). After reviewing the record, we conclude that Defendant received a fair trial and affirm the judgment of the trial court regarding his guilt.

### III. CONCLUSION

{42} We hold that the trial court did not err in denying Defendant's motion to suppress the Kansas interview statements, because Defendant does not have standing under the VCCR to pursue the claim. We conclude that the trial court acted within its discretion in admitting evidence of the statement against penal interest by the co-defendant and the testimony of Detective Torres. There was no error in the kidnapping jury instruction. Defendant did not face duplicative charges, but, under the facts of this case, he cannot be convicted of receiving a stolen vehicle. There was no cumulative error; Defendant received a fair trial. The convictions of Defendant are affirmed, except for that of receiving a stolen vehicle. We remand with

instructions for the trial court to vacate the conviction for receiving a stolen vehicle and enter an amended judgment and sentence consistent with this opinion.

{43} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice, and JOSEPH F. BACA, Justice, PETRA JIMENEZ MAES, Justice.

PAMELA B. MINZNER, Justice (specially concurring).

MINZNER, Justice (specially concurring).

{44} I concur in Sections II(B), (C), (D),(E), and (F) of the majority opinion and in the result of Section II(A), which concludes the district court did not err in denying Defendant's motion to suppress certain statements he made while in custody. I am not persuaded, however, that Defendant lacked standing to raise violations of the Vienna Convention on Consular Relations (VCCR). Majority Opinion, ¶¶ 11–15. The text of Article 36(1)(b) of the VCCR seems to me to provide or create rights and suggests that those rights are personal to the foreign national. *Standt v. City of New York*, 153 F.Supp.2d 417, 424–25 (S.D.N.Y.2001) (discussing text of Article 36(1)(b) and the Preamble to the VCCR). I would affirm the district court's decision denying Defendant's motion on a different basis.

{45} Article 36 of the VCCR states:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

 . . . .

 (b) if he [or she] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his [or her] rights under this sub-paragraph.*

VCCR, Apr. 24, 1963, art. 36(1)(b), 21 U.S.T. 77, 100–01 (emphasis added). It is true that the preamble to the VCCR states that "the purpose of such privileges and immunities [set forth herein] is not to benefit individuals but to ensure the efficient performance of functions by consular posts. . . ." It is also true that the first sentence of Article 36 contains language that suggests a limited administrative purpose. I do not believe, however, that either the preamble or the introductory language to Article 36 are necessarily inconsistent with the creation of an individual right in Article 36(1)(b).

{46} As a number of courts have recognized, "when taken in the context of the treaty as a whole, the Preamble's reference to 'individuals' is best understood as referring to consular officials rather than civilian foreign nationals." *Standt*, 153 F.Supp.2d at 425; *see also United States v. Rodrigues*, 68 F.Supp.2d 178, 182 (E.D.N.Y.1999) ("Although this clause [of the Preamble] is regularly cited as proof that the Convention was not intended to create individual rights, it seems more reasonable to interpret the word 'individuals' here as referring to consular officials, not foreign nationals."). When the term "individuals" is interpreted to refer to consular officials, it appears "that the purpose of this clause is not to restrict the individual notification rights of foreign nationals, but to make clear that the Convention's purpose is to ensure the smooth functioning of consular posts in general, not to provide special treatment for individual consular officials." *Rodrigues*, 68 F.Supp.2d at 182. Creating an individually enforceable right in foreign nationals to be notified of the associated rights of access to and assistance from their consul would facilitate the exercise of consular functions.

{47} The records of the committee and plenary meeting debates suggest that Article 36 of the VCCR was intended to confer individual rights. *See* Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul*, 18 Mich. J. Int'l L. 565, 596–99 (1997). Both committee and plenary debates over Article 36 focused on consular notification as it related to ensuring "due process safeguards for

the protection of [foreign] nationals" and the "free will of the affected national." *Id.* at 598. The United States itself "proposed language intended to 'protect the rights of the national concerned.'" *Standt,* 153 F.Supp.2d at 426 (citing 2 United Nations Conference on Consular Relations: Official Records, at 337, U.N. Doc. A/Conf.25/6, U.N. Sales. No. 63.X.2 (1963)). Others appear to have recognized that Article 36 conferred individual rights. For example, some nations supported a proposed amendment eliminating reference to a national's freedom to communicate with his consul "because they believed that the Treaty was an inappropriate place to establish an individual national's rights." Kadish, *supra,* at 596. This proposed amendment was withdrawn in the face of strong opposition and replaced with language which included the freedom of the individual to communicate with his consul. *Id.* at 596–97.

{48} Based upon the text and legislative history of Article 36(1)(b), I believe that we ought to construe the VCCR to have created individual rights. The fact that no judicial remedy is provided makes the task of defining and enforcing such rights more difficult but does not make me doubt their existence. Many of our most fundamental constitutional rights are not protected by remedies provided within the constitution itself. *See, e.g.,* U.S. Const. amend. IV. The scope of the rights created by the VCCR and the appropriate remedy for violation of those rights seem to me to be proper subjects for judicial interpretation and construction.

{49} It would certainly have been helpful to have had a definitive statement of purpose from which to begin that work. I gather from the available legislative history, however, that the rights established under the VCCR are intended to safeguard the procedural rights of foreign nationals. That is, if notified, the appropriate authorities of the sending State would help ensure that its citizen understood and claimed the process that was due. Where due process rights have been safeguarded by other means, I do not believe it is appropriate to suppress evidence obtained absent such notice. *See Breard v. Greene,* 523 U.S. 371, 377, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) ("Even were Breard's Vienna Convention claim properly raised and proven, it is extremely doubtful that the violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial."); *United States v. Chanthadara,* 230 F.3d 1237, 1256 (10th Cir. 2000) ("Even presuming the Vienna Convention creates individually enforceable rights, Mr. Chanthadara has not demonstrated that the denial of such rights caused him prejudice.").

{50} For these reasons, I conclude the VCCR is ambiguous in important respects, but we ought to construe it as recognizing individual rights on which this Defendant may rely. As a result, at a minimum, I think Defendant was entitled to notice of his rights of access and assistance. Nevertheless, as the majority has noted, the record in this case does not support a conclusion that the lack of notice prejudiced Defendant. Majority Opinion ¶¶ 19, 20. Although Defendant was not given the requisite notice, other procedural safeguards ensured that he received a fundamentally fair trial. Under these circumstances, I am persuaded that the lack of notice was not prejudicial. I therefore do not believe that the district court erred in denying Defendant's motion for suppression. For these reasons, and for the reasons contained in Sections II(B), (C), (D),(E), and (F) of the majority opinion, I would reverse only Defendant's conviction for receiving a stolen vehicle. I would affirm his remaining convictions.